OPINION. Rice, Judge: The deficiencies herein result from respondent’s determination that the gains realized by petitioner on sales of its previously rented housing and various parcels of undeveloped real estate are taxable as ordinary income rather than as capital gains. To overcome respondent’s determination that it is not entitled to capital gains treatment of the income derived from the sales of its rental housing, petitioner must prove that these rental units were not held by it “primarily for sale to customers in the ordinary course of his trade or business * * *,” within the meaning of section 117 (j) of the Internal Revenue Code of 1939:[4] Greene v. Commissioner, 141 F. 2d 645 (C. A. 5, 1944), certiorari denied 323 U. S. 717 (1944). Insofar as the various parcels of undeveloped real estate are concerned, the burden of proof is on respondent since this issue was affirmatively raised by him in an amended answer. Numerous cases, involving the application of the above-quoted portion of section 117 (j) have been decided; and, although helpful, none are decisive since, in each instance, the ultimate issue is essentially a factual one and thus dependent upon the precise facts of the instant case. Rubino v. Commissioner, 186 F. 2d 304 (C. A. 9, 1951), certiorari denied 342 U. S. 814 (1951). These cases have adopted many criteria which are of aid in determining the intent of the taxpayer with regard to the houses in question. However, no single test is decisive, Victory Housing No. 2 v. Commissioner, 205 F. 2d 371 (C. A. 10, 1953) ; King v. Commissioner, 189 F. 2d 122 (C. A. 5, 1951), certiorari denied 342 U. S. 829 (1951), and the relative significance to be accorded each of such criteria varies with the specific factual situation presented. Turning first to petitioner’s sales of its previously rented housing units, we think it clear that such units were constructed as an investment in the rental field and continued to be held for that purpose until the decision to sell them was made. Admittedly petitioner’s prior activity was almost exclusively in the field of building houses for immediate sale. However, it had demonstrated its intention to enter the rental housing field if it could obtain more liberal financing arrangements than those which were currently available to it. Upon the enactment of Title YI of the National Housing Act, petitioner commenced the construction of rental housing units under the liberal financing provisions of that title. Petitioner constructed the rental houses here in question during the years 1942 through 1944, becoming the largest builder of rental housing in the Philadelphia area during that period. On February 28, 1946, petitioner owned 1,098 rental units built at a cost of over 4 million dollars. Petitioner’s course of conduct prior to its decision to sell its rental properties indicates that it was, at that time, holding these properties for investment purposes. Thus, petitioner had voluntarily requested that certain priorities, which it already possessed, for the construction of houses for sale, be changed to priorities for rental housing. Further, all offers of tenants and brokers to purchase various houses were refused. In 1944, mortgages totaling $620,000 were prepaid on 126 of the houses and, in January or February of 1946, petitioner refinanced one of the apartment projects. Although the refinancing resulted in an immediate additional expense, it would have resulted in the lowering of interest costs in the future. We are, therefore, convinced that petitioner was simultaneously engaged in the businesses of building houses for sale and building and holding houses for rent. Cf. Walter B. Crabtree, 20 T. C. 841 (1953) ; Nelson A. Farry, 13 T. C. 8 (1949). On October 15, 1945, all restrictions on the sale of priority constructed housing were removed, although the rentals charged for such housing continued under control. Petitioner decided to liquidate its investment in its rental houses and invest in the construction and rental of regional shopping centers. Underlying this decision was the feeling that the rental houses had appreciated as much as they ever would and that this was an opportune time to sell them. Petitioner intended to maintain its investment in its. rental apartments at this time. Thus it refinanced the mortgages on one of its apartment projects in 1946 although this involved an additional charge for the prepayment of the existing mortgages. However, in 1948, petitioner decided to sell the apartments as well. We do not believe that, up until the decisions to sell its rental houses and apartments, petitioner had done anything which would disqualify these rental units for capital gains treatment under section 117 (j) upon their sale. The rental units were held for a minimum period of 19 months and a maximum period of 6 years 10 months, prior to their disposition. The average holding period was over 3 years and, until the decisions to sell, petitioner’s conduct with regard to these units was entirely consistent with that of a real estate investor. It has frequently been stated that, in determining whether the gain derived from the sale of real property is entitled to capital gains treatment under section 117 (j), the test which deserves greatest weight is the purpose for which the property was held during the period in question. Walter R. Crabtree, supra. This holding pe-. riod does not terminate upon the decision to sell but extends until the project is actually sold. Naturally, once a decision has been made to sell investment property, such property is thereafter held for sale. However, this does not preclude the application of section 117 (j) since the critical issue is whether it is held for sale by the seller “in the ordinary course of his trade or business.” To obtain capital gains treatment under section 117 (j), a taxpayer may choose the most advantageous method of liquidating his investment in properties originally acquired and held for investment purposes, so long as such method of disposal does not constitute his entrance into the trade or business of selling such properties. It may be more expeditious to enter such business in order to dispose of investment properties; but once this is done, the benefits of section 117 (j) are lost. In the recent case of Louis Greenspon, 23 T. C. 138, we stated: Although property is sold to liquidate an investment, the manner in which it is sold or disposed of can constitute a trade or business. R. J. Richards, 30 B. T. A. 1131, affd. (C. A. 9) 81 F. 2d 369; Florence H. Ehrman, 41 B. T. A. 652, affd. (C. A. 9) 120 F. 2d 607, certiorari denied 314 U. S. 668. The foregoing cases indicate that, if a liquidating operation is conducted with the usual attributes of a business and is accompanied by frequent sales and a continuity of transactions, then the operation is a business and the proceeds of the sale are taxable as ordinary income. Or, as we have said, “It is undoubtedly true that where liquidation of an asset is accompanied by extensive development and sales activity, the mere fact of liquidation will not be considered as precluding the existence of a trade or business. Where, however, the active elements of development and sales activities are absent, the fact of liquidation is not, in our opinion, to be disregarded.” Frieda E. J. Farley, 7 T. C. 198, 204. In the instant case, petitioner went beyond the steps permitted of an investor who merely wishes to liquidate his rental properties and thereby achieve capital gains treatment. The manner in which petitioner sold its rental properties put it into the business of holding them for sale to customers in the ordinary course of its business. As pointed out in Home Co. v. Commissioner, 212 F. 2d 637, 641 (C. A. 10, 1954) : One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost. Petitioner’s president testified that he considered having independent real estate brokers handle the sale of the rental housing, but decided that petitioner could effect a saving by doing the job itself. Accordingly, petitioner engaged in an aggressive sales effort and, in effect, transferred the rental housing to that part of its business which had previously been exclusively devoted to the sale of new houses. Salesmen regularly employed by petitioner in the sale of its new houses were used to sell the previously rented units. Commissions totaling $55,409.50 were paid to these salesmen for the sale of the units here involved. An extensive advertising campaign was entered into and, at times, the sale of the previously rented units was promoted in the same advertisement with new houses being offered for sale by petitioner. Measured by such criteria as the frequency and continuity of sales, Mauldin v. Commissioner, 195 F. 2d 714 (C. A. 10, 1952), the substantiality of sales, Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C. A. 9, 1951), advertising and sales promotion, King v. Commissioner, supra, cf. Delsing v. United States, 186 F. 2d 59 (C. A. 5, 1951), it is readily apparent that the rental houses were held for sale and sold by petitioner in the ordinary course of its trade or business. Petitioner refers us to Victory Housing No. 2, supra, and the court’s statement therein that a considerable number of sales in a relatively short period of time does not, of itself, put one in the business of selling real property. The result in that case is readily distinguishable since it was held that the taxpayer therein “did none of the things which we ordinarily associate and find with one actively engaged in the real estate business.” In Walter R. Crabtree, supra, we held that the taxpayer, who was simultaneously engaged in the businesses of holding houses for rent and building houses for sale, was entitled to capital gains treatment on the sale of the rental houses in his investment portfolio because such sales were unsolicited and consummated without any selling effort or advertising. In the instant case, we do not rely on merely the large number of sales involved but are compelled to conclude from all the various actions of petitioner that such sales were conducted in the ordinary course of its business of selling real property. Petitioner stresses the facts that the houses and apartments were sold “as is” and that no effort was made to renovate them for sale; also, that the purchasers took possession subject to the rights of the existing tenants under their leases. However, these are merely variations in the terms and conditions of sale from those applicable to the sale of its new houses. Any concern engaged in the sale of real estate could impose such conditions during the postwar' market favorable to real estate sellers. They do not serve to alter petitioner’s position as one who was engaged in the business of selling previously rented housing. The second and last issue here involved is whether the gains derived from the sale of various parcels of undeveloped real estate shall be treated as capital gains. Respondent contends that these parcels were, in effect, petitioner’s stock in trade, held primarily for sale to customers in the ordinary course of its trade or business. He maintains, therefore, that they are neither capital assets under section 117 (a)[5] nor is the gain derived from their sale taxable as capital gain under the provisions of section 117 (j). The burden of proving these contentions is on respondent since this issue was affirmatively raised by him iii an amended answer. Petitioner argues that these parcels were, in each instance, acquired and held for capital appreciation; that the sales of these properties were completely unsolicited; and that gains from these sales should therefore be taxable as capital gains.under section 117 (a). Petitioner points to the lack of any evidence of sales promotional activities such as listing of the parcels with real estate brokers, the posting of “For Sale” signs, and the insertion of advertisements. We must decide whether, despite the absence of the customary indicia of a selling effort, petitioner was nevertheless, engaged in the business of buying and selling undeveloped real estate. These various parcels of undeveloped land fall into three categories, namely, (1) land acquired for the construction of a shopping center; (2) land acquired in connection with the building of projects for sale; and (3) land acquired at a bargain price for eventual resale. As to the two sales made during the taxable year ended February 28, 1947,, from land acquired in the first category, we think that they are entitled to capital gains treatment. The property involved in these two sales had been acquired for investment purposes. It was to be used in the development of a shopping center which would be held for rental. When the construction of this shopping center was blocked because of zoning restrictions on the property, petitioner promptly disposed of the major portion of the property through these two sales. Respondent has not introduced any evidence to substantiate his contention that, during this year, petitioner was engaged in the business of holding undeveloped land primarily for sale to customers in the ordinary course of its business. The record does not disclose that any other sales of undeveloped property were made by petitioner during this year, or that it engaged in promotional activities incident to these sales. Respondent is, therefore, in error in his determination that these two isolated sales, during the taxable year ended February 28, 1947, of property acquired for investment purposes are not entitled to capital gains treatment. Cf. Carter-Colton Cigar Co., 9 T. C. 219 (1947). However, we think that respondent’s determination must be sustained with respect to the remaining sales of undeveloped land here in issue. These sales were made during the petitioner’s 3 subsequent taxable years and were substantial both in amount and frequency. Including the parcels which petitioner concedes to have resulted in ordinary income, there were six sales in the taxable year ended February 29, 1948, five sales the following taxable year, and seven sales during the last year in issue. The total sales prices of such properties were $164,550, $30,840, and $222,100, respectively. Petitioner’s president testified that both the property in category two (that acquired in connection with the building of projects for sale) and the property acquired in the third category (property acquired as a bargain purchase) were acquired and held for purposes of appreciation. These properties returned a negligible amount of income from billboard rentals, and there was no intention to use them in the development of future projects. Petitioner’s president testified that no efforts were made to sell any of these properties during the years in issue and that each of these sales was unsolicited. Petitioner argues that these properties were capital assets held solely, for capital appreciation and sale during future years. It attempts to explain the sales during the years in issue as unexpected, too profitable to refuse, and made for reasons of friendship, goodwill, or by condemnation. However, the essential fact seems- to be that these properties were acquired for the purpose of resale whenever a satisfactory profit could be made. Petitioner may not have aggressively promoted the sale of these properties; but, nevertheless, the frequency, and volume of its sales of undeveloped real estate and its substantial holdings of such properties convince us that these properties were held, not only for sale at some time in the future, but primarily for sale to its customers in the ordinary course of its business during each of the years here in issue. Petitioner was a dealer in undeveloped land, and gains derived from the sale of such property are taxable as ordinary income. Since we have found that petitioner was a dealer in undeveloped land during the years ended February 29,1948, through February 28,1950, it is obvious that the remainder of the West Chester Pike property, originally acquired for the development of a shopping center, was during these latter years held for sale and eventually sold to its customers during the ordinary course of its business. Decision will he entered under Bule 50. SEC. 117. CAPITAL GAINS AND LOSSES. (3) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property used in the Trade or Business.— (1) Definition of property used in the trade or business. — For the purposes of this subsection, the term “property used in the trade or business” means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a hind which would properly be includible in the inventory of the taypayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. — As used In this chapter— (1) Capital assets. — The term “capital assets” means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand! at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or'any of its possessions', or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, Issued'on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; [[Image here]]