**DILLON**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 14964.

United States Court of Appeals Eighth Circuit.

June 4, 1954.

Robert Ash, Washington, D. C. (Carl F. Bauersfeld, Washington, D. C., and Marvin G. Schmid, Omaha, Neb., were with him on the brief), for petitioner.

Louise Foster, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack and Dudley J. Godfrey, Jr., Sp. Assts. to the Atty. Gen., were on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This case comes to this court on the petition of a taxpayer to review a decision of the Tax Court of the United States. The questions presented are (1) whether the gain realized from the sale of 20 housing units by petitioner during the calendar year 1946 was taxable as a capital gain under § 117(a) and (j) of the Internal Revenue Code, 26 U.S.C.A.,

or as ordinary income under § 22(a); and (2) is the decision of the Tax Court in error in failing to allow the petitioner credit for a portion of the tax paid subsequent to the issuance of a notice of deficiency?

Jurisdiction is conferred on this court by § 1141(a) of the Internal Revenue Code as amended May 24, 1949, c. 139, § 128, 63 Stat. 107.

The evidentiary facts are not in dispute. From 1936 to 1941, inclusive, Dillon, the petitioner, was engaged in building houses for sale in Des Moines, Iowa. After Government regulations prevented private building in Des Moines in 1943, Dillon went to Omaha, Nebraska, and discussed the housing situation there with Federal Housing Administration officials, referred to in the record as F.H.A. An acute housing shortage existed in Omaha because several defense plants were located in that area and because many defense workers had moved there. The F.H.A. officials encouraged Dillon to move to Omaha and build rental housing for such workers under Title VI of the National Housing Act, 42 U.S.C.A. § 1726 et seq., Dillon went to Omaha, and, at the suggestion of the F.H.A. officials organized a corporation for the purpose of carrying out the construction of houses.

In all of his applications for priorities for building material Dillon agreed to hold the houses for rent to war workers at a fixed monthly rental and not to dispose of them except as authorized by the National Housing Agency. Orders were issued permitting the sale of a limited number of houses to war workers, and after August 1, 1943, the owner constructing houses could sell one-third of them.

The corporation which Dillon organized held title to the houses and the land on which they were constructed. When the 20 houses in issue were completed in 1944 and 1945 they were deeded to Dillon. He testified that they were deeded to him "Because actually the corporation was just a dummy to sign the mortgages and I own them personally, in fact, so they deeded them back after the houses were completed."

Upon completion of the houses they were rented to war workers on oral month-to-month tenancies under rentals approved by the F.H.A.

On October 15, 1945, all restrictions on the sale and rental of defense housing were removed by the National Housing Agency and the War Production Board. Sometime thereafter Dillon decided to sell the 20 houses because he thought it was no longer economically sound to keep them.

The 20 houses were all sold in 1946, most of them to veterans. The sales were handled by the Western Securities Company for which it received a commission of about 5 per cent of the sale price. Dillon did not hold a real estate dealer's license in 1946. He held no other rental property during the years 1942 to 1945 inclusive other than the houses he constructed under the defense housing program.

The Tax Court found " * * * that the 20 houses in question were held primarily for sale to customers in the ordinary course of business in the taxable year and net profits derived from the sale thereof during said year are taxable as ordinary income."

Section 22(a) of the Internal Revenue Code reads in essential part: " 'Gross income' includes gains, profits, and income derived from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property * * *."

Section 117(a) (1) provides: "The term 'capital assets' * * * does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *."

And § 117 (j) (1) reads in part: " * * * the term 'property used in the trade or business' means * * * not * * * (B) property held by the tax-

payer primarily for sale to customers in the ordinary course of his trade or business".

The question for determination is, therefore, whether the findings of the Tax Court are supported by the evidence or are "clearly erroneous." 26 U.S.C.A. § 1141; Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

In its opinion the court said: "We must determine the purpose for which the property is held during the taxable year in question * * *. From the record it is apparent the houses were held for rental purposes to October 15, 1945, the date when the restrictions on the sale of defense housing were removed. The record also shows that after that the houses were held for sale."

What was the business of the taxpayer after October 15, 1945? It was no longer the building of houses for rent. Was it the liquidation of his former business or was it the real estate business?

In the recent decision of the Tenth Circuit Court of Appeals in Home Co., Inc., v. Commissioner of Internal Revenue, 10 Cir., 212 F.2d 637, the court say:

> "One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost."

The petitioner was not engaged in the real estate business in the sense that term usually implies. He did not have a license to act as a real estate agent. When he decided to sell the 20 houses in issue he advertised them in a local paper. The Tax Court found that "Sales negotiations were handled by the Western Securities Company for which it received a commission of about 5 per cent of the sales price."

The Tax Court bases its determination upon the ground that "We must determine the purpose for which the property is held during the taxable year [1946] in question", and that after October 15, 1945, "the 20 houses in question were held primarily for sale to customers in the ordinary course of business in the taxable year and net profits * * * are taxable as ordinary income." The 20 houses were sold during the period from January 1, 1946, to August 8, 1946. The Court arrives at its conclusion on this point by a consideration of the business done in the taxable year 1946, and attaches no significance to the resolution of the taxpayer to liquidate his holdings in the houses in the fall of 1945. The Court cites one of its own opinions only to support its theory. Strictly applying this rule had the taxpayer decided to liquidate his holdings in December, 1945, and failed to complete the liquidation before January, 1946, the result would have been the same. Neither a statute nor the decision of any court is cited to support the theory of the Tax Court. We think the principle applied is neither legal nor reasonable, but that it is clearly erroneous. Under the evidence here the petitioner was not in the real estate business in Omaha in 1946. He was liquidating his ownership of 20 houses through a corporation engaged in the real estate business. There is no conflict in the evidence on this decisive point.

The petitioner contends further that the Tax Court erred in failing to allow credit for a portion of the tax paid subsequent to the issuance of the notice of deficiency. The amount of the alleged payment is not stated in the record nor in the brief. Since we are reversing the decision of the Tax Court, no doubt the Government will settle this matter fairly with the taxpayer.

The decision of the Tax Court is reversed.