Arthur W. SMITH and Mrs. Arthur
W. Smith,

v.

Charles H. DUNN, formerly Acting Collector of Internal Revenue.

No. 15368.

United States Court of Appeals
Fifth Circuit.

June 30, 1955.

TUTTLE, Circuit Judge, dissented
in part.

Harold E. Smith, A. H. Benton, Atlanta, Ga., Smith & Webb, Atlanta, Ga., of counsel for appellants.

C. Guy Tadlock, Ellis N. Slack, Sp. Assts. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., A. F. Prescott, Sp. Asst. to the Atty. Gen., James W. Dorsey, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

Income taxes for the years 1949 and 1950 are in dispute here, and the particular question is whether gain realized during those years on the sale of fifty-one subdivided lots is taxable as long term capital or ordinary gain. The case was tried before judge and jury, and each party moved for a directed verdict. The district court sustained the motion of the defendant collector and directed the jury to find a verdict for him. The appeal is from the judgment entered on that verdict.

Appellants, taxpayers, on joint federal income tax returns, reported income from the sale of these lots as long term capital gain. The collector determined that this was improper and that the income was derived from sales made in the ordinary course of appellants' business and was therefore subject to full tax liability.[1]

Appellant, Arthur W. Smith, alone was actively engaged in business, and he will be referred to as appellant inasmuch as his wife was joined only because the two filed joint returns. At the time of the sales and of the trial and for over fifty years he had been a practicing architect. He had never engaged in the real estate business. He had no office except that in which he practiced his profession.

The land in question originally comprised approximately ninety-five acres inherited by appellant from his father, his sister and his brother. It had been in the family more than fifty years. In 1946, while the appellant and his brother each had a one-half interest in the land, it was decided that this real estate holding should be liquidated. At that time the tract was undeveloped except for two roads running through it. With the intent of liquidating the property by an economically advantageous sale, the brothers decided that it should be subdivided into lots and they employed an engineer, who made the surveys and the subdivision and his plat is in evidence.

After consulting with one or more real estate brokers the two brothers finally contracted with Mr. Grady Duffee of Decatur, Georgia to handle the sale of the lots. He made suggestions concerning the size of the lots and the best man-

---

1. Section 117(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A., defines capital assets as including property held by the taxpayer, whether or not connected with his trade or business, but excludes "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

ner for making the subdivision. A sale price of the lots was discussed and tentatively agreed upon, and the evidence fails to disclose that the matter of price was ever discussed thereafter.

Lots adjacent to existing roads were first sold and thereafter two additional streets were opened, water mains installed and other improvements made, the total cost of which was approximately $32,000.00. That figure was comparable to the value at which the taxpayer took the lots over from the tax returns of his father, who died in 1923, and his brother, who died in 1947, but not to the actual value of the lots. There were originally one hundred forty-four lots, and ninety-two of them had been disposed of prior to 1949 and the taxpayer had treated the profits realized as capital gain and the government had not challenged his action.

Except for a compilation introduced by a revenue agent and a stipulation of counsel, the evidence consisted of testimony given by appellant and the real estate agent, Mr. Duffee.

That uncontradicted evidence showed that the entire property was turned over to Duffee in 1946 to sell according to his own plans. He was to have ten percent commission, to advertise according to his own ideas, to fix his own prices in line with the general agreement had at the outset, to pay all expenses and to remit to the taxpayer the net balance. This plan was followed throughout the connection thus made and including the

tax years in controversy here. Duffee employed his own salesmen, decided upon and arranged for his own advertisements in his own name, developed his own clientele, made sales to customers sought out and chosen by him alone. While the taxpayer had the general right to pass upon sales prices, the evidence fails to show that he ever challenged the actions of the real estate broker.

The broker conducted a continuous advertising campaign, advertising taxpayer's property along with other property handled by the broker. The taxpayer engaged in no activity during the period involved except to sign the deeds prepared by Duffee and presented to him for signature.

At the conclusion of the evidence and after an extended colloquy with counsel, the district court sustained the collector's motion for a directed verdict, holding that the facts established that the taxpayer was in the real estate business, so that the income from the sale of the lots was ordinary income rather than capital gain [2].

We do not agree with the concept of the law as set forth by the court in this charge and in what the court said in the extended colloquy with counsel preceding it. We think that the court below failed to grasp the import of the holdings of this court and laid too much stress on some of the phases of the evidence and left out of view other important principles established in our holdings.

---

2. Its charge to the jury summarizes the concept of the law on which the court below acted:

"* * * the court has reluctantly granted that motion for directed verdict. The law, as the court sees it, says that a man who owns property has a right to sell it, liquidate it, and that in so doing he does not go into the real estate business within the meaning of the income tax law. But the adjudicated cases hold that when he owns the property, and acreage, and he decides to subdivide that and that he invests other thousands of dollars into the laying out of streets and the paving of streets, and the laying of water mains to where his investment in the property is practically double

what it was originally, and then employs engineers to plat the property, and employs salesmen to sell it for him, that he is in the real estate business, and that the property is sold in the usual and ordinary course of his business within the meaning of the income tax law.

"I was very much impressed, as I am sure the jury was, with Mr. Smith and his complete fairness and honesty, his very meticulous way in which he kept his records. Every sympathy that the court had was in favor of Mr. Smith, and I would not have directed this verdict except for the fact that I felt that I was compelled to under the law * * *."

The land involved here was a capital asset unless, under the exclusions defined in the Internal Revenue Code, it was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". If we should consider the words of this exclusion alone, the problem would be relatively simple because appellant held this property solely by reason of the fact that he inherited it, and not *primarily* for sale to *customers*, his *trade and business* was architecture and its *ordinary course* related alone to that profession. But the decided cases have invested the quoted language with complexity in a process dedicated to searching out and defining the purposes of Congress, but resulting in ascribing to the exclusion a breadth and scope not inhering in the words used.

We have been called upon to construe that language in a large number of cases dealing mostly with lands, and have laid down general principles governing the decision of each individual case according to its own facts.[3] The ingredients of the tests as evolved and defined in our decisions are these:

█ What was the nature and character of the taxpayer's title to the property, the reason, purpose and intent of the acquisition and ownership and the period of its duration; and whether the property was held primarily for investment or as a part of the taxpayer's "stock in trade", i. e., as property bought, held and sold for profit?

What was the vocation of the taxpayer at the time of the sales and prior thereto, whether a real estate broker or engaged in some similar or allied business, having in mind that he may have more than one business; and considering whether the taxpayer maintained only one office and that for his main vocation, and whether his engagement in the additional business was separable from his investment in the property?

What was the extent of the taxpayer's activity and "busyness", and whether the additional business was an occupational undertaking to which he habitually devoted time, attention or effort with substantial regularity; and, if the activities were conducted through a representative, whether those activities were carried on by the representative as a part of his own business and at his own expense or primarily in behalf of the taxpayer, and particularly the character and degree of supervision or control exercised by the taxpayer over the representative?

█ What were the extent and nature of the efforts to sell the property with the view of determining whether, in their fundamental aspects, these efforts amounted merely to rendering the investment assets more attractive and hence more salable or to an engaging in the business of developing unimproved real estate for income-producing purposes? In making this determination it is proper to consider the number, extent, continuity and substantiality of sales, and whether such sales were in the ordinary course of the taxpayer's business or were carried on independently of the taxpayer's business; the extent of subdividing, developing and advertising to increase sales, and the pressure exerted upon prospective purchases, and whether those activities smacked more of a legitimate liquidation of capital assets or active sales promotion for profit, hav-

3. We are listing, in chronological order, a dozen of our cases in which we have used language from which the tests listed are distilled: Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891; United States v. Robinson, 5 Cir., 1942, 129 F.2d 297; Greene v. Commissioner, 5 Cir., 1944, 141 F.2d 645; Brown v. Commissioner, 5 Cir., 1944, 143 F.2d 468, 469; Fahs v. Crawford, 5 Cir., 1947, 161 F.2d 315; Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705; White v. Commissioner, 5 Cir., 1949, 172 F.2d 629; Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781; Delsing v. United States, 5 Cir., 1951, 186 F.2d 59; King v. Commissioner, 5 Cir., 1951, 189 F.2d 122; Lobello v. Dunlap, 5 Cir., 1954, 210 F.2d 465; and Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217.

ing in mind that the mere fact of liquidation or the intent of the taxpayer alone are not determinative.

The statements appearing in the record indicated, as we have pointed out, that the district court considered some of these ingredients but left out others entirely. A consideration of the testimony begins with the conceded fact that the taxpayer found himself with an inherited asset which he decided to liquidate, and set about to liquidate according to his ideas of the best method for bringing in the greatest return. His profession took all of his time, in fact, was so exacting that his health was depleted and he was forced to give less time to it and to receive less income. He had no experience in the real estate business, never intended to enter such a business and never took the first step towards entering the real estate business.

He looked the field over and finally employed a broker in whose integrity and judgment he had confidence, and he turned the whole problem over to him after having engaged an engineer to collaborate with the broker in laying the land out for the most advantageous sales. Mr. Duffee testified categorically and without objection that he served in the capacity of independent contractor: "An authorized agent, of course, would be under the direction of, I mean a regular agent I would think would be under the direction of the people who owned the property, and a broker, of course, is an independent contractor to sell certain properties for any member of the general public." When asked if he functioned in that capacity he replied: "That's right. As an independent contractor to do the job for Mr. Smith, for a certain stipulated percentage fee, commission".

His definition of his relationship with the taxpayer is, of course, not entitled to great weight but the facts tend to bear out his estimate. The taxpayer, as a matter of practice, gave no time to the sale of the lots except that consumed in signing deeds, exercised no supervision or control over prices or advertising or the activities of the broker at all.

The efforts of the broker were carried out independently of the taxpayer's business and were conducted as a part of the broker's own business and at his own expense and without anything but the most general supervision on the part of the taxpayer.

The court below seems to have had the idea that any taxpayer who seeks to make a better sale of a capital asset consisting of land forfeits the right to claim profits as capital gain by the mere fact of subdividing and seeking out purchasers, even though he does this by a regular real estate broker acting in the capacity we have described. We rejected that concept in Fahs v. Crawford, supra, and held that a lawyer who disposed of real estate originally purchased as an investment by selling it through a broker in subdivided lots was entitled to treat the profits as capital gain. The facts of that case so nearly resemble those here that it is controlling. Our conclusion here is in harmony also with Dunlap v. Oldham Lumber Co., supra, and with the principles enunciated in United States v. Robinson, supra, and is not inconsonant with any decision of this court.

■ Appellant characterized the whole operation as a liquidation, "Well, we thought about the property, and thought that we had better liquidate it * * * and we decided that the most advantageous way to liquidate it would be to cut it up in lots rather than to sell it as one piece, that we would realize more from it by cutting it up into lots. So we had an engineer make a tentative plat of it. * * * We finally decided that Mr. Grady Duffee * * * would serve our purpose better as a broker so we employed him as our broker to sell the property." We do not attach controlling weight to appellant's own estimate of the legal effect of what he was doing nor to Duffee's characterization of himself as an independent contractor, but their statements are entitled to weight, and we held in Foran v. Commissioner, supra, that such testimony cannot be rejected where, as here, it is not contradicted or

weakened by any other proven fact. Quoting from a Supreme Court case as authority [4], we stated, "We recognize that intent may be proved by circumstances, and that a party's testimony as to his intent may be rebutted by proof of circumstances which are inconsistent therewith. We hold that no circumstance found by the Tax Court here is inconsistent with the reasonable and uncontradicted testimony of Foran." It is not necessary for us so to hold here because the circumstances developed by the proof, taken together, bear out the quoted statements.

■■ This case, as has been true of all the others decided by this court [5], must be decided on its own peculiar facts. The ultimate fact remains always whether these inherited lands were property held by appellant primarily for sale to customers in the ordinary course of his trade or business. In resolving that question we may look to the direct testimony and to all other proven facts from which inferences may be drawn tending towards the support or rejection of the contentions of the parties with respect to the ultimate fact. We hold that the facts in this record support the claim of appellant. There was no dispute in the evidence, and the litigants concede that an instructed verdict for one of the parties was proper [6]. It is our idea that the court below instructed a verdict in favor of appellee when it should have instructed a verdict in favor of appellant. The judgment is, therefore, reversed with instructions to enter a judgment in favor of appellant.

Reversed.

TUTTLE, Circuit Judge: I concur in part and dissent in part.

TUTTLE, Circuit Judge (concurring in part, dissenting in part).

With deference to the views of the majority of the court, I must dissent from that part of the judgment of the court that directs that judgment be entered in favor of appellant. Consistently with the views we expressed in Jackson v. King, 223 F.2d 714, I think this case should be sent back for a new trial. The question as to whether the sales here in question were a liquidation of an investment or constituted the carrying on of a business should not have been taken from the jury by the trial court, and it should not be taken from the jury by us to achieve the opposite result. As we said in Jackson v. King: "Although the facts were largely undisputed, we think that no legal principle compels the findings therefrom of the ultimate fact.

4. Pennsylvania R. Co. v. Chamberlin, 288 U.S. 333, 340, 53 S.Ct. 391, 394, 77 L. Ed. 819, following which we stated, in 165 F.2d at page 707, that the court below was in error in rejecting the taxpayer's statement.

5. King v. Commissioner, 5 Cir., 1951, 189 F.2d 122.

6. The point, as stated on the index page of the Collector's brief, begins with these words: "The district court correctly held that the facts of record, all of which were undisputed, required the conclusion * * *". We agree that the facts were undisputed, and we find that the testimony of appellant is not weakened or challenged by any circumstance in evidence. That being true and no factual situation being revealed by the evidence with respect to which reasonable men might reach different conclusions, appellant is entitled to a finding in his favor as a matter of law as was the case in Goldberg v. Commissioner, 5 Cir., 223 F.2d 709.

On the other hand, we have, within the last few days, reversed for submission to a jury a case which had been decided in favor of the taxpayer by a jury, No. 15,403, Jackson v. King, 5 Cir., 223 F.2d 714. In that case, the testimony of the taxpayer King was weakened to some extent by the testimony of a revenue agent and that of two of King's former employees. Moreover, the jurors had before them fifty-seven exhibits, including some letters which had been written by the taxpayer. Those tended to challenge the correctness of King's testimony as given at the trial. An issue of fact was thus developed under such cases as Foran v. Commissioner, supra. But we do not have such a situation here where the testimony of Smith and the real estate broker were not challenged either by the testimony of other witnesses or by any writings.

* * * we think this is a conclusion on which men may reasonably differ, the very sort of question on which a jury verdict ought not to be disturbed."

I would reverse and remand for a new trial.